# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PAR PHARMACEUTICALS, INC. and | : | |
| ALKERMES PHARMA IRELAND LTD. | : | |
| | : | |
| v. | : | Civil No. CCB-11-2466 |
| | : | |
| | : | |
| TWI PHARMACEUTICALS, INC. | : | |

## MEMORANDUM

Plaintiffs Par Pharmaceuticals Inc. and Alkermes Pharma Ireland, Limited (collectively, "Par") have filed this action seeking to prevent TWi Pharmaceuticals, Inc. ("TWi") from marketing a proposed generic version of Par's Megace ES. Megace ES is a nanoparticulate formulation of megestrol acetate, a drug that is used to treat anorexia, cachexia, and unexplained weight loss in patients with HIV and AIDS. Par asserts that TWi's marketing of its generic Megace ES would infringe U.S. Patent 7,101,576 ("the '576 patent"). TWi has filed a motion for summary judgment, asserting both noninfringement and invalidity defenses. Par has cross moved for summary judgment on two of TWi's invalidity defenses, and has separately moved to strike several of TWi's defenses citing its failure to comply with local rules regarding the timely disclosure of patent litigation positions. Oral argument was held on June 14, 2013. For the reasons stated below, TWi's motion for summary judgment will be granted in part and denied in part, Par's will be granted, and Par's motion to strike will be denied.

## BACKGROUND

In 1993, Bristol Meyers Squibb ("BMS") began marketing Megace OS to treat anorexia and cachexia in AIDS patients. The drug was a medical and commercial success. In fact, the FDA subsequently approved five abbreviated new drug applications ("ANDAs") for generic versions of Megace OS, including one submitted by Par. According to TWi, by 2005, Par had the

majority of the generic Megace OS market, with approximately $25 million in annual sales.

During experimentation with reformulating the drug to reduce the particle size of the megestrol acetate to the nanoparticulate range (using Alkermes's already patented "NanoCrystal" technology), the inventors of the '576 patent discovered, "unexpectedly," according to Par, that BMS's Megace OS "resulted in exceedingly low absorption of megestrol acetate into subjects' blood streams when taken without food" and that, when taken with a high-fat meal, the "bioavailability" of the drug was 6-7 fold higher. (Par Opp. Mem., ECF No. 123, at 2). Par asserts that this "strong food effect" was previously unknown and that it is a significant weakness in Megace OS because the target patients of the drug are individuals suffering from conditions with low appetites, thus making it unlikely that the drug can be effectively administered with the appropriate food intake. The '576 patent inventors discovered, however, that their new nanoparticulate formulation "had dramatically improved bioavailability in the fasted state compared with Megace OS" and that "the fed and fasted bioavailability were similar." (*Id.* at 3). The '576 inventors filed for patent protection for this new formulation, which was granted by the Patent Office in 2006. TWi points out that the patent was rejected several times before being approved, because the PTO found, at first, that "[a]dministering megestrol to treat cancer cachexia with a reasonable expectation of success would have been obvious to one of ordinary skill in the art." (TWi Mot., Sholar Decl., ECF No. 110, Ex. 16 (PTO Aug. 5, 2005 Action, at 2-3). Par notes that the '576 patent was amended to highlight the fed/fasted benefits of the ES formulation, and it was then approved.

Around the same time, the FDA approved Par's New Drug Application for Megace ES, "a nanoparticulate megestrol acetate oral suspension product that embodies the claims of the '576 patent." (Par Opp. Mem. at 3). Unlike Megace OS, the FDA-approved label for Megace ES

states that the drug can be taken "without regard to meals." (Seringhaus Decl., ECF No. 122, Ex. 2, at PAR-MEG812075). According to Par, Megace ES has been a resounding commercial success, resulting in more than $600 million in net sales since its launch in 2005.[1]

TWi filed an ANDA seeking FDA authorization to market a generic version of Megace ES. TWi timely notified Par of this filing, and, under 21 U.S.C. § 355(b)(2)(A) (a "Paragraph IV" certification under the Hatch-Waxman Act), asserted that the '576 patent "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." Par filed suit in September 2011 to block the sale of TWi's generic product, asserting it has produced expert testimony "showing that TWi slavishly copied Megace ES and the '576 patent, element-by-element" and that the patent is otherwise valid. (Par Opp. Mem. at 4).

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

_____

[1] Par pled guilty in March to misbranding Megace ES by marketing it to geriatric patients while the FDA has approved its use only for patients with AIDS-related anorexia, cachexia, and unexplained weight loss. (*See* Sholar Decl., ECF No. 110-2, Ex. 45, *United States v. Par Pharm.*, March 5, 2013, Hearing Tr. at 14-17).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).[2] The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

In its motion for summary judgment, TWi argues both that its drug will not infringe Par's patent and that, even if it would, the patent is invalid. *First*, TWi argues it would not infringe the '576 patent because (A) it will only produce the drug, not administer it, yet the patent is for a "method" of treating HIV-related eating disorders and requires administration to be directly infringed; (B) taking TWi's definition of "no substantial difference" in Claim 1 of the patent, its drug will not meet the definition; and (C) the drug will meet the definition of more than one member of Claim 4's Markush group, avoiding that limitation. *Second*, TWi argues that the '576 patent is invalid because (A) Par is collaterally estopped from arguing the patent is nonobvious; (B) Claim 4's Markush group is not properly described; and (C) the patent was anticipated and (D) is obvious. Par addresses each of TWi's arguments but also argues that many of these arguments are improperly before the court because TWi never disclosed them to Par as required

_____

[2] Although Federal Circuit law governs the substantive issues here, district courts continue to apply the procedural law of their regional circuit in resolving patent disputes. *See, e.g.*, *Baron Services, Inc. v. Media Weather Innovations LLC*, --- F.3d ---, 2013 WL 1876511, at *5 n.6 (Fed. Cir. 2013); *Massey v. Del Labs, Inc.*, 118 F.3d 1568, 1572 (Fed. Cir. 1997).

by this district's local rules.

**I. Claim Construction**

Before addressing the parties' infringement dispute, the court must first "determine[] the scope and meaning of the patent claims asserted." *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) ("[T]he judge, and not the jury, is to construe the claims[.]") For the most part, the parties agree on the scope of the '576 patent. TWi has asserted several arguments, however, that turn on disputes between the parties concerning the construction of several key provisions of the '576 patent's independent claims.

**A. "Single administration" in Claims 1 and 4's "wherein" clauses**

TWi argues that the use of the drug in its ANDA cannot infringe Claims 1 or 4 of the '576 patent (which are the independent claims of the patent on which all the others rely) because they contain "wherein" clauses that are impossible to practice. Both claims state that the administration of the drug is

> once daily; wherein after a single administration in a human subject of the formulation there is no substantial difference [or percentage difference in Claim 4] in the $C_{max}$ of megestrol when the formulation is administered to the subject in a fed versus a fasted state, wherein fasted state is defined as the subject having no food within at least the previous 10 hours, and wherein fed state is defined as the subject having a high-calorie meal within approximately 30 minutes of dosing.

(TWi Mot., Sholar Decl., ECF No. 110, Ex. 1 ("the '576 patent"), at 42:66-67, 43:1-3, 29-41). TWi argues that these wherein clauses are impossible and nonsensical because a "single administration" of the drug cannot produce "both a fed and fasted blood level as claimed." (TWi Mem., ECF No. 110, at 22). TWi cites to, among other cases, *Chef America, Inc. v. Lamb-Weston, Inc.* for the proposition that where a "claim is susceptible to only one reasonable construction . . . [the court] must construe the claims based on the patentee's version of the claim as he himself drafted it." 358 F.3d 1371, 1374 (Fed. Cir. 2004). In *Chef America*, the Federal

Circuit declined to "redraft" a patent for making microwavable dough that stated the dough was to be heated "to a temperature in the range of about 400º to 850º," which would burn it to a crisp, when the patent inventors clearly meant that the dough would be heated "at" such temperatures. *Id.* at 1372-74. Even though this result was "nonsensical," the court held it was not in a position to redraft the patent. *Id.* TWi suggests that the '576 patent language suffers from a defect of impossibility, and, even if it is nonsensical, the "plain language" of the patent requires such a construction.

TWi's argument is unconvincing. Although "courts may not redraft claims, whether to make them operable or to sustain their validity," *Chef America*, 358 F.3d at 1374, "a construction that renders the claimed invention inoperable should be viewed with extreme skepticism." *AIA Engineering Ltd. V. Magotteaux Intern. S/A*, 657 F.3d 1264, 1278 (Fed. Cir. 2011) (citation omitted). And, claims should be read in light of the patent's entire specification and prosecution history. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). It is obvious from the patent history of Megace ES and the patent itself that the operative characteristic embodied in the wherein clauses of Claims 1 and 4 is the superior ability of the new drug to be taken with or without food. Given that the wherein clause is preceded by a description of the drug as being taken "once daily," the wherein clause can easily be read to describe different measurements of $C_{max}$ taken after distinct single administrations. This interpretation is reinforced by the prepositional phrase in the wherein clause ("*when* the formulation is administered to the subject in a fed *versus* a fasted state") implying that the clause encompasses multiple, alternative administrations. Furthermore, it appears that the claim can be proven with reference to studies showing the drug's lack of any substantial "food effect." Such studies could be read to prove that, where a single patient takes the drug daily, if comparing single administrations, whether

taken with or without food, there would be no substantial difference in their $C_{max}$ of megestrol.

Because the clause is "fairly susceptible" to a construction that renders it operable and is

supported by the defining traits of the invention as described in its specification and history, the

court need not "redraft" the claims to make them operable, but merely must interpret them in

light of the entire patent to understand them. *See Process Control Corp. v. HydReclaim Corp.*,

190 F.3d 1350, 1356-57 (Fed. Cir. 1999)

### B. "No substantial difference" in Claim 1

TWi further argues that "no substantial difference" as used in Claim 1's wherein clause

must be construed to mean "bioequivalent" under an FDA guidance concerning food effects, or

that it is otherwise indefinite and inoperable.[3] As quoted above, Claim 1 of the '576 patent

requires that there be "no substantial difference" in $C_{max}$ when the drug is administered in a fed

versus fasted state. The specification of the patent includes a brief discussion of this property:

> The invention encompasses nanoparticulate megestrol compositions wherein the
> pharmacokinetic profile of the megestrol is not substantially affected by the fed or
> fasted state of a subject ingesting the composition. This means that there is no
> substantial difference in the quantity of megestrol absorbed or the rate of
> megestrol absorption when the nanoparticulate megestrol compositions are
> administered in the fed versus the fasted state. Thus, the nanoparticulate
> megestrol compositions of the invention substantially eliminate the effect of food
> on the pharmacokinetics of megestrol.

(the '576 patent at 8:54-64). TWi notes that this language does not specifically refer to $C_{max}$, but

it does refer both to the quantity and rate of megestrol absorption which, taken together, are

mathematically related to $C_{max}$. Nevertheless, because the patent does not include any clear

numerical parameters for this limitation, TWi argues that it is unworkable unless an extrinsic

standard is applied to it.

---

[3] As discussed in Part IV *infra*, Par vigorously objects to what it views as TWi's impermissibly
late submission of this claim construction.

In response to this purported indefiniteness, TWi points to an FDA Guidance entitled "Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies, December 2002." (TWi Mot., Sholar Decl., ECF No. 110, Ex. 52 ("FDA Guidance")). TWi argues that, under this guidance, "no substantial difference" should be taken to mean "bioequivalent," which the guidance defines as 80-125% of the comparator. (*See* FDA Guidance at 7). Thus, under this construction, there would be "no substantial difference" in fed/fasted administration, as required by Claim 1, only if the difference is +/- 20% between the two administrations.[4]

In context, however, TWi does not appear to be fully applying the FDA guidance. The guidance does not limit its discussion of labeling and food effects only to a rote test of whether the difference is +/- 20%. What the guidance actually states is that a difference greater than 20% does not establish "an absence of food effect," but that, where a greater difference exists, "the sponsor should provide specific recommendations on the clinical significance of the food effect based on what is known from the total clinical database about dose-response . . . and/or pharmacokinetic-pharmacodynamic relationships of the drug under study." (FDA Guidance at 7). Importantly, the guidance charges that the results of such a study "should form the basis for making label recommendations (e.g., *take only on an empty stomach*)[.]" (*Id.*) (italics in original). Just like Par's Megace ES label, (Seringhaus Decl., ECF No. 122, Ex. 2, at PAR-MEG812075), TWi's proposed product label for its generic Megace ES product states that the drug can be "taken without regard to meals," (*id.*, Ex. 13, at ANC-MEG-0001109), implying that TWi recognizes there is "no substantial difference" in blood levels for the drug whether taken in a fed versus fasted state. (*See* FDA Guidance at 7-8) (recommending that, as an example, where

---

[4] The parties agree that the required difference under this definition would be +/- 20%, even though the range of 80-125% given by the guidance appears to permit a slight variance above 20%.

"decrease in exposure is not clinically significant[,]" a drug label can state that it "could be taken without regard to meals.").

Aside from TWi's apparent oversimplification of the FDA guidance, extrinsic evidence is a less reliable source for defining patent terms, *see Phillips*, 415 F.3d at 1318-19, particularly where the patent history and specification, alone, sufficiently informs a skilled artisan of the meaning of the term "no substantial difference" in the context of the drug's food effect. For example, the prior art (Megace OS) had a blood level difference of up to 700% depending whether it was taken with food, whereas the '576 patent specification indicates a food effect of 7-84%. The term "substantial" is not impermissible, and need not be entirely demarcated, where a skilled artisan, in light of the patent history and prior art, would recognize its range in terms of magnitude or degree. *See Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030-31 (Fed. Cir. 2002) (accepting district court's construction of the phrase "substantially below," which was added "to distinguish over the prior art during prosecution"); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367, 1369 (Fed. Cir. 2001) ("[T]he term 'substantially' is a descriptive term commonly used in patent claims to 'avoid a strict numerical boundary to the specified parameter.'); *Seattle Box Co., Inc. v. Indus. Crating & Packaging, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984) ("When a word of degree is used the district court must determine whether the patent's specification provides some standard for measuring that degree."). Pointing to "guideposts" in the patent history and specification, Par argues that the '576 patent's "no substantial difference" term would be understood, as its expert agrees, (*see, e.g.*, Fleckenstein Decl., ECF No. 118, Ex. A, ¶ 185), to incorporate a "clinically useful reduced food effect" in light of the prior art's unexpectedly significant food effect, *not* complete bioequivalence.

Particularly in light of TWi's adoption in its proposed generic drug's label of the position

that the drug can be taken "without regard to meals," as approved in the FDA guidance where a food effect is found to be "not clinically significant," the court holds that Par's proposed construction of "no substantial difference" is workable and appropriate based on the patent specification and the prior art. The '576 patent is not limited only to a formulation with an *absence* of food effect; it enables a method of treating certain conditions with a specific formulation that has greatly minimized the food effect of megestrol acetate, such that a person of ordinary skill in the art would understand that the effect was not "substantial," unlike its predecessors, and that the drug could be taken "without regard to meals," and yet still be clinically effective in the claimed dose.

## C. The "wherein" clauses of Claims 1 and 4 are substantive limitations

Finally, TWi suggests that the court should entirely disregard the wherein clauses of Claims 1 and 4 because they merely "express[] the intended result of a process step positively recited." *Minton v. Nat'l Assoc. of Sec. Dealers, Inc.*, 336 F.3d 1373, 1381 (Fed. Cir. 2003). Par disputes this characterization, and argues that the fed/fasted "wherein" clauses of Claims 1 and 4 constitute "functional claim limitations" that define the '576 invention "by what it does rather than by what it is." *See Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008); *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329-30 (Fed. Cir. 2005) ("It is correct that a "whereby" clause generally states the result of the patented process. However, when the 'whereby' clause states a condition that is material to patentability, it cannot be ignored in order to change the substance of the invention."); *Griffin v. Bertina*, 285 F.3d 1029, 1033-34 (Fed. Cir. 2002). Par argues that the "wherein" clauses containing the fed/fasted characteristic of the formulation are material to patentability because the '576 inventors were the first to discover the detrimental food effect of Megace OS (the old drug) and to discover the benefit of their specific

particle formulation in Megace ES to substantially eliminate this food effect. Notably, Par points out that the PTO rejected the '576 patent until the fed/fasted wherein clauses were included in the patent. (*See* Seringhaus Decl., ECF No. 122, Ex. 6 (4/24/2006 amendments to the '576 patent); Ex. 32 (Notice of Allowability referencing such amendments)). Because the beneficial lack of a food effect is the central defining characteristic of the method of treatment claimed in the '576 patent, the court will construe the wherein clauses as substantive claim limitations, not simply "intended results" of the claimed method.

## II. Noninfringement

In determining whether a patent is infringed, "the properly construed claims are compared to the allegedly infringing device." *Cybor Corp.*, 138 F.3d at 1454. "[E]very limitation set forth in a claim must be found in an accused product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Par alleges that TWi has infringed the '576 patent under 35 U.S.C. § 271(e)(2)(A) by filing an application "for a drug claimed in a patent or the use of which is claimed in a patent" and has brought claims of induced infringement, under 35 U.S.C. § 271(b), and contributory infringement, under § 271(c). *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364-65 (Fed. Cir. 2003); *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997) ("[A] district court's inquiry in a suit brought under § 271(e)(2) is the same as it is in any other infringement suit"). TWi argues it has not infringed the patent as a matter of law under several separate theories.

### A.  No "direct" infringement because TWi does not intend to "administer" Megace

First, TWi is entitled to summary judgment insofar as Par asserts any claim of direct infringement under § 271(a). It is undisputed that TWi has no possible intent of directly treating patients, and pharmaceutical companies cannot be held liable for directly infringing a method-of-

treatment patent where the company will not directly treat any patients. *See Warner-Lambert*, 316 F.3d at 1363. Par argues that TWi is not entitled to summary judgment on this issue because Par is admittedly not pressing a claim under § 271(a). But, because it appears the complaint is broad enough to encompass a direct infringement claim, it is appropriate to grant summary judgment to TWi on this issue, which Par has, in a roundabout way, already conceded.

### B.  Infringement of Claim 1

As explained above, TWi argues that the term "no substantial difference" in the wherein clause of Claim 1 should be defined with reference to the FDA "bioequivalence" standard used in a guidance concerning food effects. Under this definition, which exists where a drug provides +/- 20% of the same blood level as a comparator drug, there would be "no substantial difference" in $C_{max}$ when the drug is taken in a fed versus fasted state, as required by the patent, only if the measured difference was less than 20%. Par concedes that TWi's proposed generic Megace ES has shown at least a 29% difference based on a food effect. So, under TWi's construction of the term, its proposed generic would not infringe Claim 1 (or all of the dependent clauses of Claim 1). But, because the court has determined that "no substantial difference," as explained in Part I.B *supra*, should be construed with reference to what a skilled artisan would consider a substantially diminished "food effect" in light of the difference between the drug practiced in the '576 patent and the prior art, there remains a genuine issue of material fact as to whether TWi's generic drug would infringe Claim 1 of the '576 patent.

### C. Infringement of Claim 4

Finally, TWi misinterprets Federal Circuit precedent in arguing that because its proposed generic would qualify for more than one member of the Markush group in Claim 4, it would not infringe that claim. "A Markush group is a listing of specified alternatives of a group in a patent

claim, typically expressed in the form: a member selected from the group consisting of A, B, and C." *Abbott Labs v. Baxter Pharm. Products, Inc.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003). Claim 4 of the '576 patent states:

> wherein . . . the difference in the $C_{max}$ . . . is selected from the group consisting of less than about 100%, less than about 90%, less than about 80%, less than about 70%, less than about 60%, less than about 50%, less than about 40%, less than about 30%, less than about 25%, less than about 20%, less than about 15%, less than about 10%, less than about 5%, less than about 3% . . .

(43:28-37). TWi vigorously argues that, under *Abbott Labs*, it cannot infringe this language in Claim 4 because its drug, with an assumed 29% difference, impermissibly meets the claim under multiple members of the Markush group. In *Abbott Labs*, however, the Federal Circuit did not hold that multiple members of a Markush group cannot exist simultaneously in an invention, only that one and only one member can be used to meet a claim. There, the dispute turned, in part, on whether the alleged infringer's compound met one of the patent's claims because, if two or more members of the Markush group were combined, the infringer's compound had the requisite amount of "Lewis acid inhibitor[s]" to infringe. *See Abbott*, 334 F.3d at 1282-83. The Federal Circuit held that "without expressly indicating the selection of multiple members of a Markush grouping, a patentee does not claim anything other than the plain reading of the closed claim language[,]" and, thus, that the claims at issue required a *single* inhibitor "selected from" the Markush group to meet the requisite level—a combination of two or more ran afoul of the "plain language." *Id.* 1280-83. In other words, *Abbott Labs* stands only for the proposition that one cannot aggregate members of the Markush group to meet a claim, an issue that does not apply here. There is no indication that, if the alleged infringer had enough of two "Lewis acid inhibitor" members of the Markush group to each independently infringe the claim, the presence of multiple Markush group members would have somehow nullified its infringement.

13

Thus, the fact that TWi's drug may infringe multiple members of Claim 4's Markush group does not undermine Par's infringement allegations. *See WesternGeco LLC v. ION Geophysical Corp.*, 876 F. Supp. 2d 857, 896 (S.D. Tex. 2012); *Teva Pharm USA, Inc. v. Amgen, Inc.*, 2010 WL 3620203, at *7 (E.D. Pa. 2010);[5] *see also Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1296-97 (Fed. Cir. 2000) ("[I]f a patent requires A, and the accused device or process uses A and B, infringement will be avoided only if the patent's definition of A excludes the possibility of B. . . . [W]hat matters is not that the patent describes A and B as different, but whether, according to the patent, A and B must be mutually exclusive."). *Abbott Labs* is silent on whether, as TWi asserts, the fact that its drug has a difference that is less than 100%, *and* 90%, *and* 80% and so on renders the Markush group inoperable. Such a reading of the patent would be a strange result, given that, mathematically, the drafter and PTO would have known that each succeeding member of the Markush group would qualify under the preceding one. Accordingly, TWi's argument that its drug cannot infringe the '576 patent because it would do so under several alternative members of Claim 4's Markush group is without merit.

## II. Invalidity

TWi also asserts that the '576 patent is invalid as a matter of law under several theories. The Supreme Court recently held that an invalidity defense must be "proved by clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2242 (2011).

### A. Collateral Estoppel

TWi first argues that a Board of Patent Appeals and Interferences ("BPAI") decision on an application "related to" the '576 patent precludes Par from arguing that the '576 patent was nonobvious. This argument appears entirely without merit, and Par has moved for summary

---

[5] Unpublished cases are cited only for the soundness of their reasoning, not for any precedential value.

judgment on this issue. To preclude an adversary's relitigation of an issue, a party must show:

> (1) that "the issue sought to be precluded is identical to one previously litigated"; (2) that "the issue was actually determined in the prior proceeding ("element two"); (3) that the issue's determination was "a critical and necessary part of the decision in the prior proceeding" ("element three"); (4) that the prior judgment is final and valid ("element four"); and (5) that the party against whom collateral estoppel is asserted "had a full and fair opportunity to litigate the issue in the previous forum" ("element five").

*Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006) (citation omitted). Among other plausible arguments, there appear to be at least three reasons TWi cannot preclude Par from arguing the '576 patent is nonobvious based on the related BPAI determination.

First, "a party seeking to avoid the collateral estoppel effect of an earlier factual determination is obliged to make one of two showings: that 'the party against whom the doctrine is invoked had a heavier burden of persuasion on that issue in the first action than he does in the second, or [that] his adversary has a heavier burden in the second action.'" *Id.* at 220-21 (citation omitted). TWi does not dispute that, in this action, it must prove obviousness by clear and convincing evidence, whereas, in the BPAI proceeding, the PTO had to meet only a preponderance standard to show *prima facie* obviousness before the burden shifted to Par to show that secondary considerations should overcome this showing. *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992). If not entirely fatal, this change in the burden of proof nearly undermines TWi's preclusion argument on its own.

Second, setting aside the unlikelihood that the BPAI proceeding could at all be construed to cover the obviousness issue in this litigation, which concerns a different patent the PTO presumptively concluded was not obvious, TWi admits that the primary claim assessed in the BPAI proceeding did not include Par's fed/fasted limitation. (*See* TWi Reply, ECF No. 132, at 31). The validity of that limitation must be assessed separately here, but given its centrality to the

'576 patent, and, indeed Par's entire argument about the value of Megace ES, TWi cannot marginalize the importance of the fed/fasted characteristic of the drug in an effort to conflate the two proceedings. TWi argues that the fed/fasted characteristic is inherent in the drug, and is not really a limitation of the '576 patent, but these arguments go to the *merits* of the parties' dispute, not to whether that dispute can be disregarded for the purposes of using the BPAI proceeding to invalidate the patent. Thus, the court could not plausibly find that the issue here is identical to the one before the BPAI when a large part of Par's nonobviousness arguments (and, in particular, its secondary considerations) turn on the benefits of Megace ES in light of its ability to be taken without food.

Finally, "federal courts traditionally refer to the preclusion rules of a fellow adjudicative body when determining the preclusive effect of a ruling from that body." *Johnson v. Whitehead*, 647 F.3d 120, 129 (4th Cir. 2011). Par convincingly argues that TWi can point to no authority suggesting the type of one-party, uncontested proceeding it invokes for issue preclusive effect is actually given any such effect by the BPAI. (*See* Par Reply, ECF No. 137, at 20-22). TWi asserts that the BPAI gives a preclusive effect to "final" judgments and that, because Par did not appeal, the proceeding was "final." Parties may not be able to relitigate an entire identical claim at the BPAI, but the rules for claim preclusion (or res judicata) do not automatically apply to issue preclusion (or collateral estoppel), where one party seeks, offensively, to hold the other to the result of a discrete conclusion in a prior, nonmutual proceeding. *See In re Swanson*, 540 F.3d 1368, 1376-79 (Fed. Cir. 2008). TWi cites to no authority to support its assertion that the issues in a one party BPAI proceeding can be given preclusive effect in this way and applied against a party in district court litigation, nor does TWi point to any caselaw, whatsoever, where a federal court has taken the type of BPAI proceeding TWi invokes and applied it to the obviousness

determination of a different patent dispute. Such preclusion would seem to be clearly erroneous and Par is therefore entitled to summary judgment on this issue as a matter of law.

### B. Written Description of Claim 4

Under 35 U.S.C. § 112, a patent specification must contain a "written description" that would "clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (brackets and citations omitted). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* TWi argues that the Markush group limitation in Claim 4 ("wherein . . . less than 100% . . .") was not sufficiently described anywhere in the patent specification because it references $C_{max}$ (the maximum concentration of the drug in the blood), where the '576 patent specification only contains similarly worded descriptions of $T_{max}$ (time to $C_{max}$) and AUC (total absorption). (*See* the '576 patent at 8:54-67, 9:1-17). $C_{max}$, $T_{max}$, and AUC are all mathematically related (they are calculated with reference to one another), but TWi disputes they are interchangeable. TWi admits that Example 9 of the patent specification shows fed/fasted $C_{max}$ differences of 7.3%, 9.2%, and 13.7% in human subjects and that Example 2 shows differences of 71% and 84% in dogs, fitting within the Markush ranges in Claim 4, but TWi disputes Par's reliance on the dog study (because the claim is only for treating humans), and argues the ranges described in the claim are otherwise too broad and unsupported by the specification.

While the written description must demonstrate that the inventor invented "the full scope of the invention as finally claimed in the patent," *see Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1259 (Fed. Cir. 2004), "it is unnecessary to spell out every detail of the invention in the

specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). TWi insists that the narrower ranges present in the specification do not support the "less than 100% . . ." ranges in Claim 4, and that Claim 4 attempts to encompass too much, but such a determination can only be made with reference to how a person skilled in the art would perceive such percentage differences (only an expert could opine on the scale of those differences in this context) and whether the patent's specification would adequately convince such an expert that the inventor possessed the claimed drug. Thus, TWi is not entitled to summary judgment on this issue. While TWi does point to what can at least be described as a weakness in the drafting of the '576 patent, given the "clear and convincing evidence" standard TWi is held to on its invalidity defenses, there is a genuine issue of material fact as to whether the written description supports Claim 4's Markush grouping.

### C. Anticipation

TWi argues that U.S. Patent 5,399,363 (the '363 patent) anticipated the '576 patent. Par has cross moved for summary judgment on this issue. To prove anticipation, "the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention." *K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1377 (Fed. Cir. 2012) (quotation omitted). The elements of the new invention must be disclosed by the prior art "arranged as in the claim." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010) ("The requirement that the prior art elements themselves be 'arranged as in the claim' means that claims cannot be 'treated ... as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims

their meaning.'") (citation omitted). Par points out that the '363 patent was fully considered by the PTO before it granted the '576 patent, and argues that the court should therefore afford the PTO substantial deference on this issue. *See Microsoft*, 131 S. Ct. at 2243 ("[A] government agency such as the PTO [is] presumed to do its job.") (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).

The '363 patent "relates to anticancer agents in the form of particles." (TWi Mot., Sholar Decl., ECF No. 110, Ex. 3 ("the '363 patent"), at 1:15-18). It was apparently acquired by Alkermes in its ongoing prosecution of patents related to the NanoCrystal technology that the '576 patent also relies on. On its own, the '363 patent appears several significant steps removed from the '576 patent, although TWi argues that all of the elements of the '576 are present and arranged the same in the prior art.

Par convincingly demonstrates, however, that the '363 patent does not anticipate the '576 patent for a variety of reasons. First, the '363 patent appears to apply only to "anticancer agents," though Par admits megestrol acetate is listed as one of many thousands of such compounds. TWi argues that the '363 patent enabled the treatment of HIV-related anorexia because it covered megestrol, as an "anticancer agent," for the treatment of human ailments generally. Here, TWi seems to be stretching the language of the patents. For example, it states in its reply, "[Par] cannot deny that the '363 patent enables *what is claimed in the '576 patent* – using megestrol to treat weight loss in cancer *and* AIDS patients." (TWi Reply, ECF No. 132, at 22 (emphasis added)). However, the '363 patent does not claim a treatment for weight loss, nor does it contemplate the treatment of HIV/AIDS or any other specific condition. The '363 patent's focus entirely on "anticancer agents" and its silence as to any efficacy in treating anorexia and related disorders, or HIV/AIDS, undermines TWi's anticipation defense. *See In re Montgomery*, 677

19

F.3d 1375, 1382, 1382 n.13 (Fed. Cir. 2012) ("[A] document that recited administration of all known compounds for treatment of all known diseases, with no evidence that any of these treatments would be effective, would not inherently anticipate all method-of-treatment claims involving those compounds and diseases.").

Second, the '363 patent only indicates that an "effective amount" for the dosing of each compound can be ascertained by a skilled artisan, generally, whereas the '576 patent specifies a claimed dosage amount to be effective for its specific therapy (of treating weight loss in certain patients) and that the dosage would be "once daily." TWi argues that the '363 patent encompasses the '576 patent's claimed dosage amount because the prior art states that "the selected dosage" of the anticancer compounds "can be readily determined by one skilled in the art and depends upon the particular anti-cancer agent, the desired therapeutic effect, the route of administration, the desired duration of treatment, and other factors." (the '363 patent at 8:1-5). But, broad, nonspecific dosage guidelines where "devising dosage parameters . . . would require undue experimentation based on the teachings of [the prior art]" do not anticipate subsequent patents that specify the dosage for a particular therapeutic effect. *See Impax Labs, Inc. v. Aventis Pharm, Inc.*, 545 F.3d 1312, 1315-16 (Fed. Cir. 2008).

Third, the '363 patent makes no mention of the megestrol acetate nanoparticulate's beneficial lack of a food effect when taken in an oral suspension formulation (as defined by the "wherein" clauses of Claims 1 and 4 in the '576 patent), which is obviously, in Par's view, the central characteristic of the '576 patent. TWi argues that there is no need for the '363 patent to have indicated this benefit because it is "merely an inherent property of the formulation." *See Santarus Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1353-54 (Fed. Cir. 2012); *In re Huai-Hung Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011) ("[T]he claimed "food effect" is an inherent property

of [the drug] itself."). Par argues that the '363 patent did not anticipate the '576 patent because it, at most, invited experimentation with a wide range of compounds and contained no hint of a benefit concerning the food effect of megestrol acetate in its older form or the need to compensate for it in patients with appetite related conditions. Furthermore, "[i]nherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed Cir. 2002). Par convincingly argues that the '363 patent permits a nearly limitless array of drug formulations and delivery mechanism combinations, which cannot plausibly be held to have "necessarily" enabled the development and implementation of the specific method claimed in the '576 patent targeting the treatment of wasting diseases using a drug without a substantial food effect.

Finally, along the same lines, Par accuses TWi of cherry picking disparate parts of the '363 patent to find all of the claimed elements, in direct contravention of the "as arranged" requirement set forth in *Therasense*. Because TWi asserts that most of the properties Par claims are not present in the '363 patent are inherent in the prior art, it disputes Par's assertion that the elements are not arranged as in the '576 patent and argues that because the prior art contained a method for making megestrol acetate particles of the size contained in the '576 patent, the claims were arranged the same way in both. In short, TWi argues that the '363 patent enabled a nanoparticulate formulation of megestrol acetate for the treatment of human beings, and that, setting aside its label of that compound as "anticancer," the prior art sufficiently encompassed everything the '576 patent purports to claim.

Notably, despite TWi's insistence that the anticipation of the '576 patent by the '363 patent is clear, it did not appear to raise this argument until its summary judgment motion.

Because the '363 patent (1) included such an overwhelmingly extensive list of "anticancer" compounds to which it was applicable, while making no mention of HIV/AIDS, anorexia, or related wasting disorders, (2) enabled NanoCrystal technology that could be used to dispense these compounds, not necessarily any specific method-of-treatment or therapy for any specific condition as claimed in the '576 patent, and, (3) importantly, did not anticipatorily enable any method of mitigating a detrimental food effect for a drug targeting wasting conditions, Par is entitled to summary judgment on TWi's claim of anticipation as a matter of law.

### D. Obviousness

Finally, TWi argues that the '576 patent was obvious based on prior art. "Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective [or secondary] considerations of nonobviousness." *OSRAM Sylvania, Inc. v. Am. Induction Tech., Inc.*, 701 F.3d 698, 706 (Fed. Cir. 2012). "Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Id.* (quotation marks and citation omitted).

This issue essentially turns on a series of factual disputes that are not resolvable on summary judgment. TWi argues that the Megace OS Monograph (which disclosed the use of megestrol acetate to treat AIDS-related body mass disorders) and an unrelated patent application from 2002 that sought to patent a megestrol-related drug for the treatment of AIDS-related wasting diseases render the '576 patent obvious. Par argues that this other material is irrelevant because it related only to Megace OS-sized particle formulations of megestrol and ignores the

food effect of Megace OS that was discovered by the '576 inventors. Par argues that the '576 inventors applied the nanoparticulate technology to megestrol and "surprisingly" discovered it eliminated the newly discovered food effect of Megace OS. TWi replies that there was motivation present in the field to find a better formulation for megestrol to treat AIDS-related wasting disease because the drug's limited efficacy was known, whereas Par argues that the source of this inefficacy was unknown before the food effect was discovered and that an ordinary skilled artisan would not have applied the nanoparticulate technology to substantially eliminate the food effect, nor would they have necessarily discovered this benefit. Both parties argue that *KSR Int'l Co. v. Teleflex, Inc.* supports their view that the method contained in the'576 patent was either "obvious to try" or not based on the prior art. *See* 550 U.S. 398, 418-19 (2007).[6]

Both parties also engage in genuine factual disputes over whether "secondary considerations" rebut any obviousness finding. Such considerations include "commercial success, long-felt need, copying, unexpected and superior results, wide spread acceptance in the field, and initial skepticism." *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1370 (Fed. Cir. 2012). Par argues that Megace ES is a tremendous commercial success, that the fed/fasted benefit of its formulation was unexpected, that the stabilizer technique applied in the '576 patent was unexpectedly effective, and that Megace ES is fulfilling a long-felt need for additional interventions in treating AIDS-related wasting illnesses. TWi disputes each of these contentions, and argues, regardless, that this is "a strong case of obviousness based on the prior

---

[6] "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. Although common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."

art references of record" that cannot be overcome by secondary considerations. *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364-65 (Fed. Cir. 2012).

The underlying factual issues in this obviousness analysis are too fact-bound and close to resolve on summary judgment. For example, TWi claims that megestrol was known to be poorly soluble, that a megestrol formula "with greater efficacy" would have been desired in light of the poor clinical results of the drug for many AIDS patients, that the food effect benefits of the NanoCrystal technology were being promoted by Alkermes long before the '576 patent application, and, thus, that a skilled artisan would have applied the nanoparticulate technology to Megace OS. But, Par has adduced expert testimony that the food effect problem was *not* expected, even if the inefficacy of Megace OS in many patients was, and that it would not have been obvious to try a nanoparticulate formulation of the compound to solve this problem because the problem was not known to exist. Similarly, Par has adduced evidence that some prior art suggested an increased $C_{max}$ of megestrol acetate would *not* help the efficacy of the drug, making its discovery that such concentrations do have therapeutic benefits even more surprising. In short, there are various genuine factual issues to unravel and, therefore, TWi is not entitled to summary judgment on the issue of obviousness.

## IV. Par's Motion to Exclude

Separately, Par has filed a motion in limine to exclude many of TWi's summary judgment arguments. The District of Maryland has extensive local rules on the disclosure of contentions and arguments in patent cases. Local Rule 804.3 states that, "unless ordered by the Court, in all cases alleging patent infringement based upon a Paragraph IV certification under 21 U.S.C. § 355, the parties shall[,]" within thirty days from the date of the scheduling order, serve on the plaintiff "its Initial Disclosure of Invalidity Contentions" and "its Initial Disclosure of

Non-Infringement Contentions[.]" A party may amend such Contentions only "upon written consent of all parties or, for good cause shown, upon leave of the Court." Loc. R. 804.6. Similarly, Rule 805.1 contains detailed rules for cross-disclosure of claim construction arguments, which may be amended "only on stipulation of all parties or by Order . . . which shall be entered only upon a showing of excusable subsequent discovery or new information or extraordinary good cause." Loc. R. 805.1(e). Furthermore, under the Hatch-Waxman Act, applicants seeking to produce generic drugs must send a notice letter to patent holders that includes "a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed." 21 U.S. § 355(j)(2)(B)(iv)(II).

Par argues that under the local rules and Hatch-Waxman, which "imposes a duty of care" on a generic applicant seeking to challenge a patent, *see Yamanouchi Pharm. v. Danbury Pharmacal*, 231 F.3d 1339, 1347 (Fed. Cir. 2000), TWi should be precluded from making several arguments contained in its motion for summary judgment. First, Par argues that TWi's new claim construction arguments should be stricken. TWi does not dispute that its "proposed claim construction" in the parties' joint construction statement does not include all of its proposed claim construction positions in its motion for summary judgment. (*Compare* ECF No. 44 at 2; *with* ECF No. 110 at 16). TWi originally argued that the term "no substantial difference" in Claim 1 of the '576 patent was "indefinite." (ECF No. 44 at 2). In its motion for summary judgment, it offers a new definition of the term ("bioequivalence" under FDA standards) or, alternatively, it falls back on the position that the term is indefinite. TWi argues that because it originally argued the term was indefinite, it had a duty to offer a definition, and breached no local rule in doing so.

Par also argues TWi's "single administration" impossibility argument regarding the

"wherein clauses" of both Claims 1 and 4, its Markush group alternative argument, and its argument that the fed/fasted clauses are not limitations but merely state results should all be considered matters of claim construction and disregarded. Par further argues that most of TWi's noninfringement and invalidity arguments are also procedurally defective because they were not disclosed in the mandated filings. These arguments are: as to noninfringement, (1) TWi's "impossibility" argument, (2) the "no substantial difference" limitation, and (3) the overlapping Markush group alternatives; and as to invalidity, (4) TWi's argument regarding the insufficient description of Claim 4, and (5) its anticipation (but not obviousness) argument. Par argues it is prejudiced by consideration of these arguments because it did not tailor discovery to address them.

As demonstrated by the court's analysis above, however, Par had sufficient discovery to address each of TWi's arguments. TWi also insists that it gave sufficient notice of all of its arguments to Par. Because the court finds it is preferable to address the merits of each of the issues confronting the parties rather than to exclude them procedurally, and because excluding them would require subjectively parsing the parties' various disclosures, the court will decline to exclude any of TWi's arguments on procedural grounds. Accordingly, Par's motion to strike will be denied.

## CONCLUSION

For the reasons stated above, TWi's motion for summary judgment will be denied, Par's cross-motion for partial summary judgment will be granted, and Par's motion to strike will be denied. A separate Order follows.

| | |
|---|---|
| _____7/17/13_____ | _____/s/_____ |
| Date | Catherine C. Blake |
| | United States District Judge |